[882 NE2d 389, 852 NYS2d 820]

INNOPHOS, INC., Formerly Known as PHOSPHATES ACQUISITION, INC., Respondent, v RHODIA, S.A., et al., Appellants.

Argued January 2, 2008; decided February 12, 2008

## POINTS OF COUNSEL

*Shearman & Sterling LLP,* New York City (*Richard F. Schwed* of counsel), for appellants. I. The Comision Nacional del Agua claims do not fall within the definition of "taxes." (*Muzak Corp. v Hotel Taft Corp.,* 1 NY2d 42; *Corhill Corp. v S.D. Plants, Inc.,* 9 NY2d 595; *Uribe v Merchants Bank of N.Y.,* 91 NY2d 336; *Matter of Trump-Equitable Fifth Ave. Co. v Gliedman,* 57 NY2d 588; *Matter of Riefberg,* 58 NY2d 134; *Popkin v Security Mut. Ins. Co. of N.Y.,* 48 AD2d 46; *SR Intl. Bus. Ins. Co. Ltd. v World Trade Ctr. Props., LLC,* 445 F Supp 2d 320; *Washington State Dept. of Social & Health Servs. v Guardianship Estate of Keffeler,* 537 US 371; *242-44 E. 77th St., LLC v Greater N.Y. Mut. Ins. Co.,* 31 AD3d 100; *People v Illardo,* 48 NY2d 408.) II. The purchase and sale agreement as a whole demonstrates that the water bills are not "taxes." (*Rooney v Slomowitz,* 11 AD3d 864; *150 Broadway N.Y. Assoc., L.P. v Bodner,* 14 AD3d 1; *Pearce, Urstadt, Mayer & Greer Realty Corp. v Atrium Dev. Assoc.,* 77 NY2d 490.) III. At a minimum, the agreement is ambiguous and discovery is necessary. (*Federal Ins. Co. v Americas Ins. Co.,* 258 AD2d 39.)

*Kirkland & Ellis LLP,* Washington, D.C. (*Christopher Landau, Jeffrey S. Powell, Andrew B. Kay* and *Angela M. Butcher* of counsel), and *Kirkland & Ellis LLP,* New York City (*Peter A. Bellacosa* of counsel), for respondent. I. The lower courts correctly concluded that the Comision Nacional del Agua claims are "taxes" under the purchase and sale agreement. (*God's Battalion of Prayer Pentecostal Church, Inc. v Miele Assoc., LLP,* 6 NY3d 371; *Greater N.Y. Mut. Ins. Co. v Mutual Mar. Off.,* 3 AD3d 44; *Harris S.A. De C.V. v Grupo Sistemas Integrales De Telecomunicacion S.A. De C.V.,* 279 AD2d 263; *Wyoming v Oklahoma,* 502 US 437; *Commonwealth Edison Co. v Montana,* 453 US 609; *World Wide Mins., Ltd. v Republic of Kazakhstan,* 296 F3d 1154; *International Assn. of Machinists & Aerospace Workers, [IAM] v Organization of Petroleum Exporting Countries [OPEC],* 649 F2d 1354; *Rush-Presbyterian-St. Luke's Med. Ctr. v Hellenic Republic,* 877 F2d 574; *MOL, Inc. v Peoples Republic of Bangladesh,* 736 F2d 1326; *State Univ. of N.Y. v Patterson,* 42 AD2d 328.) II. The lower courts correctly concluded that discovery is unwarranted. (*Ruttenberg v Davidge Data Sys. Corp.,* 215 AD2d

191; *W.W.W. Assoc. v Giancontieri,* 77 NY2d 157; *Evans v Famous Music Corp.,* 1 NY3d 452; *Janos v Peck,* 21 AD2d 529; *A.H.A. Gen. Constr. v New York City Hous. Auth.,* 92 NY2d 20; *Wald v Marine Midland Bus. Loans,* 270 AD2d 73; *Masciotta v Morse Diesel Intl.,* 303 AD2d 309; *Hooper Assoc. v AGS Computers,* 74 NY2d 487.)

## OPINION OF THE COURT

CIPARICK, J.

Defendants are a group of related companies that were in the business of producing and selling phosphate products from various locations in Canada, Mexico and the U.S. In early 2004, an agency of the Government of Mexico, the Comision Nacional del Agua (National Water Commission [CNA]), began an audit of the water usage of defendants' operation in Mexico—Rhodia Fosfatados de Mexico, S.A. de C.V. In March 2004, the CNA sent a letter to Rhodia Fosfatados's legal representative in Mexico that advised the company of the audit and requested information and documentation regarding the company's "use [of] national surface or underground waters" pursuant to a concession the Government of Mexico granted to the company. This letter also alleged that Rhodia Fosfatados had not properly fulfilled its fee obligations for the use or utilization of national waters.

In June 2004, plaintiff Innophos, Inc., formerly Phosphates Acquisition, Inc., and defendants entered into a comprehensive, 76-page purchase and sale agreement in which plaintiff acquired Rhodia Fosfatados and defendants' other operations for a purchase price of over $530 million. At this time, plaintiff was apparently unaware of the ongoing CNA audit or the possibility that it might be charged for past-due fees owed to the CNA, as defendants had not disclosed the audit during negotiations.

The agreement provides, in article VII, that defendants are obligated to "indemnify and hold [plaintiff] harmless against . . . Taxes of the Mexican Subsidiaries with respect to any taxable period (or portion thereof) that ends on or before the Closing Date" for all amounts. The agreement defines "Tax or Taxes" as:

> "all . . . United States federal, state or local or non-United States taxes, assessments, charges, duties, levies or other similar governmental charges of any

nature, including all income, gross receipts, employment, franchise, profits, capital gains, capital stock, transfer, sales, use, occupation, property, excise, severance, windfall profits, stamp, stamp duty reserve, license, payroll, withholding, ad valorem, value added, alternative minimum, environmental, customs, social security (or similar), unemployment, sick pay, disability, registration and other taxes, assessments, charges, duties, fees, levies or other similar governmental charges of any kind whatsoever, whether disputed or not, together with all estimated taxes, deficiency assessments, additions to tax, penalties and interest."

The agreement further provides, in article IX, that plaintiff "shall be indemnified and held harmless . . . for any and all [Losses], actually suffered or incurred by [plaintiff] arising out of or resulting from" the breach of any representation or warranty made in the agreement. The indemnification for "Losses" is subject to a deductible and a cap of $15.9 million and $79.5 million respectively.

On August 13, 2004, the deal formally closed. Two months later, as a result of the audit, the CNA issued several resolutions that ordered plaintiff—as successor-in-interest to Rhodia Fosfatados—to pay outstanding preclosing water usage fees in excess of $130 million* for the years 1998 through 2002. Plaintiff demanded that defendants indemnify it for the outstanding fees pursuant to articles VII and IX of the agreement. Defendants declined to indemnify plaintiff pursuant to article VII, but agreed to assume the defense and control of the CNA claims as "Losses," pursuant to article IX of the agreement, liability for which, if any, would be subject to the deductible and cap.

Plaintiff thereafter commenced this breach of contract action and subsequently moved for partial summary judgment, seeking a declaration that the CNA fees are "Taxes," as defined in the agreement. Supreme Court granted plaintiff's motion and held that the CNA fees "constitute taxes, as such term is defined in the purchase agreement . . . [, which] doesn't confine itself to what we would think of as taxes in the classic sense."

---

* The outstanding water usage fees are actually now said to be in the range of $20 million to $30 million.

The Appellate Division, with one Justice dissenting in part, affirmed and opined that "the parties were involved in a sophisticated, multimillion dollar business transaction . . . [in which t]hey chose to define the term 'Tax or Taxes' with broad, sweeping language . . . [that] cover[s] the government assessment at issue" (38 AD3d 368, 369 [2007]). The Appellate Division concluded that "[i]t is virtually impossible for us to imagine how two sophisticated parties could have made the language any more sweeping than it is" (*id.* at 370). The Appellate Division granted leave to appeal to this Court and certified the following question: "Was the order of the Supreme Court, as affirmed by the decision and order of this Court, properly made?" We answer that question in the affirmative and, therefore, affirm the Appellate Division's order.

The issue here is whether the CNA charges are "Taxes," for which defendants must fully indemnify plaintiff, or "Losses," which are subject to the cap and deductible, as those terms are understood in the agreement. We have stated previously that "[t]he fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent[, and that t]he best evidence of what parties to a written agreement intend is what they say in their writing" (*Greenfield v Philles Records*, 98 NY2d 562, 569 [2002] [citations and internal quotation marks omitted]). "Extrinsic evidence of the parties' intent may be considered only if the agreement is ambiguous, which is an issue of law for the courts to decide" (*id.* [citation omitted]).

Defendants characterize the CNA fees as simply a "water bill" for the purchase of a commodity from the Government of Mexico that is acting in a proprietary capacity, and not in a governmental capacity. As such, defendants contend that the fees do not fall under the agreement's definition of "Taxes" because a "water bill" is not similar to any of the governmental charges enumerated in the agreement. Defendants further contend that the lower courts' interpretation of the agreement renders language in the agreement, which requires indemnification subject to a deductible and cap for certain consequences of government action, superfluous because under the courts' interpretation any governmental charge would be considered a "Tax." At best, defendants assert that the agreement is ambiguous and discovery is necessary.

On the other hand, plaintiff asserts that the governmental charges set forth in the agreement's definition of "Taxes"

are all charges that involve a governmental exercise of sovereign, rather than of proprietary authority. Plaintiff submits that the CNA fees were assessed by the Government of Mexico in its sovereign capacity, and, as such, they are "similar" to the examples listed in the definition, particularly to a severance tax. We agree with plaintiff that the CNA fees are "similar," though not identical, to a severance tax. Black's Law Dictionary defines a "severance tax" as "[a] tax imposed on the value of . . . natural resources extracted from the earth" (Black's Law Dictionary 1499 [8th ed 2004]). A severance tax is based on the volume of a natural resource exploited pursuant to a governmental concession (*see Wyoming v Oklahoma*, 502 US 437, 442 [1992]).

Both plaintiff's and defendants' experts agree that Mexico's Constitution vests ownership over natural resources, including the water at issue here, in the Mexican State. As defendants' expert affidavit acknowledged, "[w]ater is an asset of the public domain of the Nation . . . [and i]f a private person desires to use or exploit such . . . resources, it must secure a concession . . . [, the fees for which are] calculated in accordance with the volume of water used." Thus, under the Constitution of Mexico, water is a state-owned natural resource that is regulated by the government in its capacity as a sovereign, and the exploitation of such is only through the granting of a concession. Further, the CNA determined the usage fees by calculating the volume of water extracted from a river and a lagoon connected to the Gulf of Mexico. Hence, the CNA water usage fees are "Taxes," as that term is defined in the agreement, because they are a "similar governmental charge"—like a severance tax.

In conclusion, no ambiguity exists in this comprehensive agreement, and, as such, it is unnecessary for us to resort to extrinsic evidence to determine the agreement's meaning. The CNA water fees are "similar governmental charges," as defined in the agreement, assessed by the Government of Mexico in its capacity as sovereign for the exploitation of a natural resource, here water from its rivers and lagoons, pursuant to a concession. Therefore, applying settled principles of contract interpretation, we conclude that the agreement's definition of "Taxes" is sufficiently broad to encompass the CNA water charges. Plaintiff should be indemnified pursuant to article VII of the parties' agreement, and partial summary judgment was properly awarded.

Defendants' remaining contentions are without merit.

Accordingly, the order of the Appellate Division should be affirmed, with costs, and the certified question answered in the affirmative.

Chief Judge KAYE and Judges GRAFFEO, READ, SMITH, PIGOTT and JONES concur.

Order affirmed, etc.